# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 17-14117-CIV-ROSENBERG/MAYNARD

**JAMES BUHS,**

     **Petitioner,**

**v.**

**SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,**

     **Respondent.**

_____/

### REPORT RECOMMENDING THAT PETITION FOR
### WRIT OF HABEAS CORPUS UNDER § 2254 BE GRANTED

James Buhs ("Buhs") is a Florida inmate seeking a writ of *habeas corpus* under 28 U.S.C. § 2254 ("§ 2254 Petition").  DE 8.  Buhs challenges his 2010 state court (Martin County, Florida) conviction for morphine trafficking, being a felon in possession of firearms, and the unlawful sale of fireworks.  Buhs pled guilty to these charges and was sentenced to 25 years in prison.  He raises one claim of ineffective assistance of counsel ("IAC") based on his counsel's alleged failure to inform him of an available prescription defense to the morphine trafficking charge.

I previously recommended that the § 2254 Petition be denied and this recommendation was adopted.  DE 27, DE 29.  On appeal, the United States Court of Appeals for the Eleventh Circuit ruled that "the state post-conviction court's adjudication of [Buhs' IAC] claim was based on an unreasonable determination of facts under § 2254(d)(2)."  *Buhs v. Sec'y, Fla. Dept. of Corrections*, 809 Fed. Appx. 619, 621 (11th Cir. 2020).  The Eleventh Circuit thus remanded the case "for an evidentiary hearing and *de novo* review of Mr. Buhs' [IAC] claim consistent with this opinion."  *Id.* at 635.

On January 12, 2021, consistent with the Eleventh Circuit's opinion, I held an evidentiary hearing at which testimony and exhibits relevant to Buhs' claim were received.  DE 61.  At my request, the parties filed post-hearing supplemental briefing.  DE 64, DE 66, DE 67.  This report provides the background of the case, including summaries of the Eleventh Circuit's opinion and the evidence presented at the evidentiary hearing; the standard of review; and a *de novo* review of Buhs' IAC claim consistent with applicable law and the Eleventh Circuit's opinion.  For the reasons set out below, I respectfully **RECOMMEND** that the § 2254 Petition be **GRANTED**.

## BACKGROUND

### A.    Arrest, Search, Charges, and Guilty Plea Proceedings in State Court

Based on a concerned citizen tip that Buhs was selling large amounts of fireworks from his home and possessed automatic firearms, detectives confirmed that Buhs was a federally convicted felon without a license to sell fireworks.  DE 11-2 at 8-9 (Arrest Affidavit).  On July 2, 2009, the detectives executed a search warrant at Buhs' home and discovered $4,000 in cash, "an immense quantity of fireworks" inside the home and backyard shed, chemicals for making fireworks, and a cache of firearms and ammunition. *Id.* at 17-59 (Search Warrant Inventory).  In an air conditioning vent, they also found a white plastic bag containing a bottle with 215ml of liquid morphine, three prescription bottles containing 90.1 grams of morphine pills, and other prescription bottles containing alprazolam, amitriptyline, tizanidine, and cyclobenzaprine. *Id.* at 55, 169; DE 51-1 at 307-320 (Photos of Prescription Bottles).  Buhs was arrested that day and he soon thereafter retained private defense counsel, Paul Auerbach.  DE 11-2 at 8-9, 283, 308.

On July 16, 2009, 14 days after his arrest, the state charged Buhs by information with being a felon in possession of firearms and ammunition in violation of Fla. Stat. § 790.23 (count one); morphine trafficking in violation of Fla. Stat. § 893.135(1)(c)(1) (count two); unlawful

possession of alprazolam, a controlled substance, in violation of Fla. Stat. § 893.13(6)(a) (count three); and the illegal sale of fireworks in violation of a county ordinance (count four) in Martin County case number 43-2009CF-000927-A. *Id.* at 61-62 (Information).

On July 21, 2009, 19 days after his arrest, Buhs entered into a written plea agreement with the state in which Buhs agreed to plead guilty to count one for firearms possession, count two for morphine trafficking, and count four for the illegal sale of fireworks; the state agreed to drop count three for unlawful possession of alprazolam/xanax because Buhs had a valid prescription for the substance. *Id.* at 64-70 (Felony Plea Form); 72-94 (Change of Plea Hearing).  In the plea agreement, Buhs confirmed his understanding that there was a factual basis for the charges against him, that he would refrain from challenging the search warrant, and that he was giving up his right to a trial. *Id.* at 64-70 (Felony Plea Form).  As set out in a separate written substantial assistance agreement signed on the same date as the plea agreement, Buhs agreed to offer substantial assistance to law enforcement in exchange for the possibility of a favorable sentence recommendation if Buhs' cooperation led to an arrest or conviction.  DE 51-1 at 13-16 (Substantial Assistance Agreement).

At his change of plea hearing that same day, the court went over the charges and the maximum sentence Buhs faced (a mandatory minimum of 25 years up to 30 years in prison on the morphine trafficking charge, up to 15 years in prison on the firearms possession charge, and up to 60 days in jail on the fireworks charge—for a total of up to 45 years and 60 days).  DE 11-2 at 82-83, 85.  Buhs agreed he understood that he was waiving his rights to a jury trial, to present defenses he might have had, to cross-examine witnesses, and to contest the evidence against him. *Id.* at 84-85.  The court advised Buhs that his open plea meant that his sentence would be left up to the court subject to "some information provided at the time of sentencing, which hopefully will be favorable

to you and may even result in an agreement with the state." *Id.* at 85.

The court commented that it was "very early on in this case … it's a very, very new case" such that "there's a great deal of information that would have been provided to Buhs had this case not been so new and it went through it[]s normal process" and further made clear that Buhs was waiving his right to investigate the case prior to entering his plea. *Id.* at 87-88. Buhs said he understood. *Id.* at 88. The court stated that Buhs' decision to plead guilty early on was "relatively unusual," after which Buhs confirmed he had no "hesitations or concerns about waiving [his] right to all that discovery and all that information which may have provided defenses to [him]" and he understood that all the information he might have received "could have provided [him] with defense and maybe a complete defense to all these charges" but that "whatever defenses [he] might have had [he was] waiving by entering this plea." *Id.* at 88-89. The court ultimately found a factual basis for the plea and found the plea was made freely and voluntarily with a knowing and intelligent waiver of Buhs' rights and the consequences of the plea, and the court accepted it. *Id.* at 91. Buhs was released on his own recognizance pending sentencing, so he could attempt to provide substantial assistance based on his agreement with the state. *Id.* at 89, 91-92.

## B.      State Court Sentencing

Prior to sentencing, Buhs' counsel filed a presentencing memorandum seeking a downward departure based on mitigating circumstances. DE 11-2 at 100-50 (Presentence Memorandum). Regarding the morphine trafficking charge, the memorandum explained that Buhs had kept the morphine in his house as favors for two people, Alan Rosenbaum and Jerry White, and also "as a hoarder." *Id.* at 101. Buhs indicated that the liquid morphine belonged to Rosenbaum's mother who passed away in March of 2006. *Id.* According to Buhs, Rosenbaum had asked Buhs to hold his deceased mother's liquid morphine because Rosenbaum was leery of keeping it in his home

because of his small children. *Id.* Buhs further stated that White, his mother's boyfriend, had been prescribed morphine at the VA Hospital and had asked Buhs to hold the morphine with other items that had been salvaged from White's mobile home following a destructive hurricane. *Id.* Buhs attached two letters from Rosenbaum and White in support of these asserted facts, as well as a copy of White's morphine prescription. *Id.* at 115-41.

On March 1, 2010, nearly eight months after his arrest, Buhs appeared for sentencing. *Id.* at 116-60 (Sentencing Hearing). At sentencing, Buhs' counsel argued that Buhs was a "hoarder" who never sold or used the morphine and never sold the firearms or used them for illegal activities. *Id.* at 163-65. Buhs testified that he obtained the morphine legally and it had gotten "lost in the shuffle" after White and Rosenbaum never returned to collect the morphine that Buhs stored in his home "for safe keeping." *Id.* at 165-66. Detective Jacob Sirmans testified about the execution of the search warrant at Buhs' home, including law enforcement's recovery of 19 firearms, thousands of rounds of ammunition, and the morphine located in a hallway air conditioning vent with a pistol and other prescription medications. *Id.* at 167-70. ATF Agent Patrick Columns testified that, while he had kept "almost daily" contact with Buhs about ongoing investigations, Buhs' cooperation failed to result in any arrests or convictions. *Id.* at 175-77. Ultimately, the court found that, regardless of Buhs' efforts, it could not sentence him below the 25-year statutory minimum for the morphine trafficking charge because his assistance failed to result in arrests or convictions. *Id.* at 192-94. Buhs was sentenced to 25 years in prison on the morphine trafficking charge, 15 years in prison on the firearms charge, and 2 days in jail on the illegal sale of fireworks charge, all running concurrently. *Id.* at 194. The court also imposed a $50,000 fine. *Id.*

### C.     Post-Conviction Proceedings

On March 8, 2010, Buhs filed a *pro se* motion to withdraw his plea alleging manifest

injustice and asserting that his plea was involuntary because his counsel coerced him into pleading guilty to the trafficking charge even though counsel was aware of a valid defense against this charge. *Id.* at 258-62 (Motion to Withdraw Plea). Buhs alleged that, prior to entering the plea, he told his counsel of the circumstances surrounding the trafficking charge which would have resulted in a "viable defense" to this charge. *Id.* at 260. Buhs further alleged that his counsel's response was to recommend that Buhs enter an open plea, after which counsel said he would explain the circumstances at sentencing such that the court would dismiss the trafficking charge. *Id.* at 260-61. According to Buhs, had it not been for his counsel's "misadvice regarding the court dismissing the trafficking offense at sentencing, he would not have entered an open plea to the court but would have instead elected to go to trial." *Id.* at 261. On April 30, 2010, Buhs filed an amended memorandum in support of his motion to withdraw plea where he also alleged that counsel was ineffective for failing to investigate and discover that the evidence seized at his home was obtained via a "tainted" search warrant. *Id.* at 273-78 (Amended Memorandum).

On June 24, 2010, the court held a hearing during which Buhs and his counsel testified. *Id.* at 280-334 (Motion to Withdraw Plea Hearing). Buhs testified first. Regarding the morphine trafficking charge, Buhs reiterated his claim that his counsel had advised him "I was pleading out to this but that when [counsel] explained the defense behind the drugs that the judge would set that charge aside." *Id.* at 285-86.

Buhs' counsel testified next. He explained that when he was first brought on as counsel, he knew Buhs "had been cooperating or attempting to cooperate with ATF." *Id.* at 309. Counsel's initial focus was to review the search warrant which he considered "critical" because "if the search warrant wasn't good, then the case fell apart." *Id.* at 310. After reviewing the warrant and finding it valid, counsel shifted strategies toward negotiating with the state. *Id.* He recalled going with

Buhs to meet an ATF agent but described counsel's role in the substantial assistance agreement process as being "very, very limited" as it was "none of [his] business." *Id.* at 310-11.

Regarding the morphine trafficking charge, as explained in the presentence memorandum, counsel said he knew Buhs was holding the morphine for acquaintances with valid prescriptions and that Buhs had kept the prescription drugs in the air conditioning vent to hide them from Buhs' girlfriend's young son. *Id.* at 311-12.   In counsel's view, Buhs was not "trafficking" the drugs in the traditional sense but counsel understood that "the law says with this quantity it's trafficking and that's the end of the discussion." *Id.* at 312.   Counsel did not inform Buhs that the circumstances of his possessing the morphine "would somehow amount to [a] legal defense or a reason that the Court will dismiss the charge of trafficking" based on counsel's opinion that "the circumstances plus the ATF cooperation would result in a diminished sentence." *Id.* at 312-13. Counsel admitted to signing the substantial assistance agreement and conceded that it was "definitely" possible he told Buhs that he could get his sentence down to three to five years if he pled guilty and provided substantial assistance. *Id.* at 313-16, 323-24.   Counsel noted that part of the plea deal was avoiding a federal prosecution such that counsel felt he had "accomplished something." *Id.* at 324.   Ultimately, the court rejected Buhs' claim that counsel coerced him into entering the plea, found that Buhs' plea was knowing and voluntary, and denied Buhs' request to withdraw the plea. *Id.* at 331-34.

Buhs appealed the denial of his motion to withdraw the plea and the state responded in opposition. *Id.* at 376-91 (Buhs' Initial Brief on Appeal), 393-410 (Answer Brief).   On February 27, 2013, Florida's Fourth District Court of Appeal *per curiam* affirmed without a written opinion. *Id.* at 412; *Buhs v. State*, 145 So. 3d 107 (Fla. 4th DCA 2013).

On August 22, 2014, Buhs filed a post-conviction motion under Fla. R. Crim. P. 3.850

raising one claim of being "deprived of his right to the effective assistance of counsel by his trial counsel's failure to advise him of the availability of a prescription defense if he proceeded to trial." DE 11-1 at 463-75 (Amended Motion for Post-Conviction Relief).  According to Buhs, his counsel knew that he had obtained the morphine from third parties with valid prescriptions and held the morphine as favors to them, and thus should have recognized that Buhs had a viable "prescription defense" under Florida law.  *Id.* at 470-72.  The defense was viable, he claimed, because White and Rosenbaum were ready and willing to testify as witnesses in support of the prescription defense.  *Id.* at 471.  In addition, Buhs claimed he would have "been risking very little" by going to trial since the maximum sentence for the trafficking charge was 30 years – only 5 more years than the 25-year mandatory minimum sentence.  *Id.*at 480 (State's Response to Motion for Post-Conviction Relief), 482-83 (Order Granting Evidentiary Hearing).

At first, the state responded that Buhs' claim required an evidentiary hearing and one was set.  *Id.*at 480 (State's Response to Motion for Post-Conviction Relief), 482-83 (Order Granting Evidentiary Hearing).  The state later reversed course, however, asserting an evidentiary hearing was not needed because it was "clear from the record that defense counsel knew about the prescription defense and made a tactical decision to argue for a downward departure based on substantial assistance to law enforcement." *Id.* at 487-649 (State's Supplemental Response).

The next day, on March 9, 2016, the postconviction court canceled the evidentiary hearing and issued an order denying Buhs' motion for postconviction relief.  *Id.* at 659-63 (Order Vacating Order Granting Evidentiary Hearing and Denying Amended Motion for Post-Conviction Relief).  The postconviction court incorporated by reference the state's supplemental response, adopted the reasoning therein, and found that defense counsel "testified that based upon the facts in [Buhs'] case, he did not believe the prescription defense was a viable option." *Id.* at 662. Because Buhs

"had been in possession of the morphine for years, hid it in an air conditioning vent, and admitted to using it," his counsel "decided that the best course of action was for [Buhs] to enter a plea and attempt to mitigate his sentence on the trafficking charge with substantial assistance to the ATF." *Id.* The state post-conviction court concluded that Buhs cannot establish deficient performance and, moreover, Buhs "acknowledges in his motion that counsel had advised him of the prescription defense" and was thus not entitled to relief. *Id.*

Buhs appealed the denial of his motion for postconviction relief. *Id.* at 665-66 (Notice of Appeal), 668-716 (Buhs' Initial Brief). On February 9, 2017, Florida's Fourth District Court of Appeal *per curiam* affirmed without a written opinion. *Id.* at 725; *Buhs v. State*, 229 So. 3d 1241 (Fla. 4th DCA 2017).

On review, I previously recommended that Buhs' § 2254 Petition be denied. DE 27. This recommendation was based on my finding that while the § 2254 Petition was timely, the state court's factual findings regarding defense counsel's performance were entitled to deference and Buhs failed to establish prejudice. DE 27. Over Buhs' objections, my recommendation was adopted and the § 2254 Petition was denied. DE 29. Buhs appealed the denial of his § 2254 Petition and was granted a certificate of appealability. DE 32, DE 36.

### D.    The Eleventh Circuit's Opinion

On appeal, the Eleventh Circuit ruled that "the state post-conviction court's adjudication of [Buhs' IAC] claim was based on an unreasonable determination of facts under § 2254(d)(2)." *Buhs v. Sec'y, Fla. Dept. of Corrections*, 809 Fed. Appx. 619, 621 (11th Cir. 2020). Following a comprehensive summary of information drawn from the record on appeal, the Eleventh Circuit concluded that:

> After a thorough review of [the state postconviction court's] decision and the
> record, we conclude that the denial of Mr. Buhs' claim was based on an

unreasonable determination of facts in light of the evidence in the state court record.

*Id.* at 626.   Having so concluded, the Eleventh Circuit addressed Buhs' claim under *Strickland*.

First:

> With respect to the *Strickland* performance prong, the state post-conviction court rendered its decision based on a finding that Mr. Auerbach considered "utilizing the prescription defense [but] made the tactical decision to argue for a downward departure based on substantial assistance to law enforcement."  That finding is critical because if Mr. Auerbach had made an informed decision to disregard the prescription defense, then the decision would be afforded substantial deference. *See, e.g., Strickland*, 466 U.S. at 681, 104 S. Ct. 2052 ("[B]ecause the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment."). **But the post-conviction court's finding that Mr. Auerbach made an informed decision is based on two subsidiary findings, neither of which has any support in the record**.
>
> First and most importantly, the post-conviction court found that Mr. Auerbach "testified that based upon the facts in [Mr. Buhs'] case, he did not believe the prescription drug defense was a viable option." That finding was plainly and clearly erroneous. Mr. Auerbach never testified that he considered or evaluated the prescription defense for the morphine trafficking charge. He was never asked about it, never said anything about it, and certainly did not state whether he believed it was a viable defense under the circumstances.
>
> Second, the post-conviction court found that Mr. Auerbach "conducted a thorough investigation of the law and facts relevant to plausible options." Again, this finding is unsupported. There is no direct evidence that Mr. Auerbach investigated, researched, or considered the prescription defense for the morphine trafficking charge.
>
> The state post-conviction court's reliance on these two unsupported findings severely undermines the deference normally owed under § 2254(d)(2). *See Wiggins*, 539 U.S. at 528, 123 S. Ct. 2527 (where a state court based its conclusion on a clear factual error, even a "partial reliance" on the erroneous finding can demonstrate the unreasonableness of the state court's decision). As we have explained, a finding constitutes an unreasonable determination of facts if it has no support in the record. *See Bui v. Haley*, 321 F.3d 1304, 1315 (11th Cir. 2003).

*Buhs*, 809 Fed. Appx. at 626-27 (emphasis added).

The Eleventh Circuit noted that the only time defense counsel discussed his representation

of Buhs was at the plea withdrawal hearing, which "addressed a separate and narrower question—

whether Mr. Buhs' plea was involuntary" and happened before Buhs raised his IAC claim based on the prescription defense. *Id.* at 627.  The Eleventh Circuit zeroed in on this testimony and found that it "tends to show … that [defense counsel] never considered, researched, or investigated facts or law related to the prescription defense" and "suggests that the *only* strategy he considered was challenging the warrant."  *Id.* at 627-28 (emphasis in original).  The Eleventh Circuit acknowledged the possibility that defense counsel never discussed going to trial with Buhs based on an informed understanding of the prescription defense but found no evidence that defense counsel "knew about the prescription defense *and* … knew that it extended to agents of prescription holders." *Id*. at 628 (emphasis in original).  "Indeed, Mr. Auerbach's testimony and actions suggest he did not recognize the breadth of the defense" including counsel's testimony suggesting his belief "that there was no exception to the trafficking charge" and counsel's "little interest" taken in Buhs' chances of successfully providing substantial assistance.  *Id* at 628-29. While acknowledging that substantial assistance was the "key" to a downward departure, counsel testified that he was only "under the impression" that Buhs could provide substantial assistance based on a "feeling." *Id.*

Second, as to *Strickland* prejudice, the Eleventh Circuit found as follows:

The state post-conviction court's conclusion about prejudice was predicated on its finding that Mr. Buhs "acknowledged" in a filing that Mr. Auerbach had advised him about the prescription defense. This finding was also clearly erroneous.

The state post-conviction court did not refer to any specific filing or motion to support this proposition and, like the magistrate judge, we see no such acknowledgement from Mr. Buhs in the record. The state argues that the proposition can be inferred from any one of three motions. In each of the three motions to which the state refers, however, Mr. Buhs merely stated that Mr. Auerbach advised him that the trial court could dismiss the trafficking charge at sentencing based on the circumstances of his possession. This is not a concession that Mr. Auerbach advised him about the prescription defense at the guilt-determination phase. Again, the prescription defense is an affirmative defense to trafficking, which if proven would have established Mr. Buhs' innocence.

We further note that there is evidence that Mr. Auerbach did not advise Mr. Buhs about the prescription defense. For one, Mr. Buhs declared this fact under oath in his verified Rule 3.850 motion. *See Valle v. State*, 705 So. 2d 1331, 1333 (Fla. 1997) (factual allegations in a verified Rule 3.850 motion are sufficient as a matter of law to withstand summary denial and warrant an evidentiary hearing, so long as the allegations are not conclusively rebutted by the record). *Cf. Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1305 n.23 (11th Cir. 2011) (verified pleadings may be treated as affidavits for purposes of summary judgment where the allegations are made based on personal knowledge, set out facts that would be admissible in evidence, and show that the declarant is competent to testify on the matters stated) (citing *United States v. Four Parcels of Real Prop.,* 941 F.2d 1428, 1444 n. 35 (11th Cir. 1991)).

In addition, when asked whether he told "Mr. Buhs at any point that [the] scenario for how he came into possession with the drugs would somehow amount to [a] legal defense or a reason that the Court will dismiss the charge of trafficking," Mr. Auerbach answered "[n]o." He "couldn't have" because the charges "could have been dismissed if I could have won on the search warrant. But we discussed that and I felt that that was a useless task." And, again, Mr. Auerbach testified that "taking the case to trial was never discussed." These statements paint a relatively clear picture that Mr. Auerbach advised Mr. Buhs about two options—challenging the search warrant or pleading guilty and seeking a downward departure based upon substantial assistance at sentencing.

As noted, the state post-conviction court ultimately refused to hold an evidentiary hearing or receive other evidence from Mr. Buhs. The state and the post-conviction court initially (and correctly) recognized that it was necessary to ascertain facts about whether Mr. Auerbach had investigated the prescription defense and made a tactical decision to forgo it. But the state post-conviction court cancelled the evidentiary hearing and ruled on the Rule 3.850 motion only one day after the state filed its supplemental response, without affording Mr. Buhs any opportunity to respond or present additional evidence. Had the state post-conviction court held an evidentiary hearing, we might be faced with a different case.

*Buhs*, 809 Fed. Appx. at 629-30.

Based on its finding "that the state court's ruling was based on an unreasonable determination of facts," the Eleventh Circuit vacated the denial of Buhs' § 2254 Petition, which "opens the door for us to review the merits of Mr. Buhs' ineffectiveness claim *de novo*." *Id.* at 30 (citing *Jones*, 540 F.3d at 1288 n.5).

The Eleventh Circuit expressed reluctance to rule on Buhs' claim, however, because

"'many of the factual allegations in [Mr. Buhs'] federal petition remain untested" and Buhs "has never been afforded an opportunity to develop [his claimed] factual basis in the crucible of an evidentiary hearing—nor, just as importantly, has the State had the opportunity to challenge them in an adversarial hearing." *Id.* (citing *Williams v. Alabama*, 791 F.3d 1267, 1276 (11th Cir. 2015); *Pope v. Sec'y Dep't of Corr.*, 680 F.3d 1271, 1294 (11th Cir. 2012). According to the Eleventh Circuit, (1) Buhs' allegations that counsel did not advise him of a prescription defense "have support in the record" and, if true, could establish deficient performance under *Strickland*; and (2) the record "suggests that the defense was viable" such that if defense counsel "did not investigate the prescription defense because of neglect or oversight, then it is possible that his performance was deficient." *Id.* at 630-31. Thus, an evidentiary hearing was necessary because:

> There is no direct evidence regarding whether Mr. Auerbach considered or investigated a prescription defense with respect to the morphine that Mr. Buhs received from others, and the record is underdeveloped as to what relevant, contemporaneous facts Mr. Auerbach knew or could have known at the time. There is some evidence—from the verified Rule 3.850 motion—that Mr. Auerbach did not advise Mr. Buhs about the prescription defense. But that evidence remains untested.
> . . .
> Buhs has not had an opportunity to further explain how he came into possession of the drugs, why he stored them as he did, or whether he used them. A court may find his explanations credible in the course of a hearing, or it may not. Just as importantly, Mr. Buhs and the state have not had the opportunity to question Mr. Auerbach about what he knew at the time regarding the circumstances of the morphine possession, whether that knowledge factored into his strategy, and whether he communicated his analysis to Mr. Buhs.

*Id.* at 631-32.

The Eleventh Circuit agreed with my prior finding "that there was no legal bar preventing Mr. Buhs from presenting a prescription defense to a jury." *Id.* at 632. In so doing, the Eleventh Circuit found that the state's argument that a prescription defense "would not have flown well at trial" was premised on purported facts that were "tenuous at best and certainly not fatal to Mr.

Buhs' claim in light of the evidence in the record supporting the prescription defense." *Id.* at 632-33.

Prior to concluding, the Eleventh Circuit explained the relevant inquiry to assess *Strickland* prejudice as being "'whether the defendant was prejudiced by the 'denial of the entire judicial proceeding ... to which he had a right.'" *Id.* at 633 (citing *Lee v. U.S.*, 137 S. Ct. 1958, 1965 (2017) (quoting *Roe v. Flores–Ortega*, 528 U.S. 470, 483 (2000)). *Lee* involved an attorney's incorrect advice regarding mandatory deportation after a petitioner pleaded guilty to a drug distribution charge. *Lee*, 137 S. Ct. at 1963. All parties agreed the attorney performed deficiently under *Strickland* and the Supreme Court found that petitioner established *Strickland* prejudice because "he showed a reasonable probability that but for his attorney's erroneous advice he would have proceeded to trial, even though he did not show that he necessarily would have been better off by going to trial." *Buhs*, 809 Fed. Appx. at 634 (citing *Lee*. 137 S. Ct. at 1967–68). According to the Eleventh Circuit:

> Like the petitioner in *Lee*, Mr. Buhs may not have understood the consequences of his guilty plea due to his counsel's allegedly deficient performance. Assuming Mr. Auerbach did not advise him about a plausible affirmative defense, then Mr. Buhs would not have known he was pleading guilty to a charge for which he may have in fact been innocent. And, as with the petitioner in *Lee*, there is some contemporaneous evidence—and not merely "post hoc assertions," *id. at 1967*— that Mr. Buhs would have elected to go to trial but for the deficient advice. In his motion to withdraw his plea, Mr. Buhs stated that he would have gone to trial had he known it was not possible for the trial court to dismiss the morphine trafficking charge at sentencing.
>
> We also conclude, at this stage and in light of the existing record, that it would not have been irrational for Mr. Buhs to put the defense to the jury. *See id.* at 1968–69. *See also Padilla v. Kentucky*, 559 U.S. 356, 372, 130 S. Ct. 1473, 176 L.Ed.2d 284 (2010) (explaining that "a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances"). It is true that a trial would allow the introduction of adverse evidence with some "shock value." It is also true that Mr. Buhs had already been pursuing a cooperation strategy, even before he hired Mr. Auerbach, and there may have been some logic to that approach at the time. But the trafficking charge carried a 25-year mandatory minimum and a

14

30-year maximum, and the only way for Mr. Buhs to get a sentence beneath the minimum was to provide substantial assistance that led to an arrest or conviction. If Mr. Buhs knew of the prescription defense, he could have reasonably stopped pursuing the cooperation strategy, particularly if he did not have valuable information that could lead to an arrest or conviction. We do not definitively opine on these matters, as the district court will be in a better position to sort them out after an evidentiary hearing.

At this point, Mr. Buhs has sufficiently alleged Strickland prejudice, as elucidated by *Hill* and *Lee*, and should be able to develop the record further at an evidentiary hearing.

*Id.* at 634.  The Eleventh Circuit thus remanded the case "for an evidentiary hearing and de novo review of Mr. Buhs' [IAC] claim consistent with this opinion."  *Id.* at 635.

### E.    Evidentiary Hearing

I convened a hearing on January 12, 2021.  Before the hearing, the parties filed a Joint Pre-Hearing Report with a statement of uncontested facts and stipulated exhibits. DE 51, DE 51-1. Four witnesses testified at the hearing:  Buhs; Detective Jacob Sirmans; and Assistant State Attorneys David Lustgarten and Christopher Gaston.  In addition, Stipulated Exhibits Nos. 1, 2, and 4-63 were received into evidence with no objection by either party.  DE 61 at 9.  Regarding Exhibit No. 3, Respondent stipulated that this presentence memorandum was admitted in state court but did not stipulate to the veracity of the information contained therein. *Id.*[1]

---

[1] The Eleventh Circuit identified as important the need to determine what, if anything, Buhs' counsel considered, investigated, and knew regarding the prescription defense at the time of Buhs' guilty plea.  *Buhs*, 809 Fed. Appx. at 631 ("There is no direct evidence regarding whether Mr. Auerbach considered or investigated a prescription defense with respect to the morphine that Mr. Buhs received from others, and … what relevant, contemporaneous facts Mr. Auerbach knew or could have known at the time."); *see also id.* at 633 ("Just as importantly, Mr. Buhs and the state have not had the opportunity to question Mr. Auerbach about what he knew at the time regarding the circumstances of the morphine possession, whether that knowledge factored into his strategy, and whether he communicated his analysis to Mr. Buhs").  Buhs' counsel did not testify at the evidentiary hearing.  While not mentioned by any party, as I noted on the record towards the end of the evidentiary hearing, Florida Bar records show that Mr. Auerbach was deceased as of the date of the evidentiary hearing.  DE 61 at 165; *see also* Member Profile for Paul I Auerbach, FL Bar No. 866342, https://www.floridabar.org/directories/find-mbr/profile/?num=866342, last accessed 5/9/2022.

Up first, **Buhs** testified as follows.  After his arrest in July 2009, law enforcement took him to the jail and briefly questioned him about the weapons and fireworks.  *Id.* at 19.  He then returned home, and had been home for about a half hour, when a law enforcement officer questioned him about medication that was found in the house.  *Id.*  There was discussion about rearresting him but one of the officers said that Buhs "had had enough for one night."   *Id.* at 20.  He was initially charged with possession of a weapon by a felon and illegal sale of fireworks and was later charged with trafficking in morphine and possession of alprazolam—xanax.  *Id.*  He "was advised to enter a plea of no contest" and was sentenced to "25 years for the morphine, 15 years for the possession of weapons, and it was two days for the fireworks."  *Id.* at 20-21.

Prior to entering his no contest plea, the State did not provide any discovery.  *Id.* at 21.  His defense counsel did not go over what he believed the State's evidence was going to be against him prior to the plea; his counsel reviewed the warrant and determined it was valid.  *Id.*  Regarding evidence against Buhs, his counsel said "they had the purchase of the fireworks, they had the weapons that they found, and the medication that was found in my house."  *Id.*  The recovered medication consisted of a bottle of liquid morphine and a couple of bottles of morphine pills.  *Id.* at 21-22.

The morphine pills belonged to Jerry White, a family friend who lived with Buhs' mother and had been associated with the family for 20-25 years.  *Id.* at 22.  The standard prescription pill bottles came from the VA and bore White's name on the label; "[t]he label said it was morphine, and I seen [White] taking them before, so I recognized them."  *Id.* at 23.  His mother, who was up north at the time, had asked Buhs to salvage what he could from her trailer after it was shut down due to gas leaks so he "pulled a lot of personal property [and] the medication, brought it back to my house, and called and notified them what I had found."   *Id.* at 23-24.

The liquid morphine belonged to a friend of Buhs' mother, Alan Rosenbaum.  *Id.* at 22. Rosenbaum's mother's name, Mary, was on that medication.  *Id.* at 24-25.  After Rosenbaum's mother died, Buhs went to offer his condolences at which time Rosenbaum asked Buhs to hold the liquid morphine until Rosenbaum could get his mother's estate settled and also out of concern for his grandson who Rosenbaum was taking care of at the time.  *Id.* at 25.

Buhs stored the medication in an air conditioning vent because he had been dating a lady with three teenagers and did not want them to get their hands on it.  *Id.* at 26.  He denied using the morphine or selling it.  *Id.* at 26-27.

Prior to entering his plea, Buhs told his counsel how he came into possession of the medication and why he put it in the vent.  *Id.* at 25-27.  Buhs acknowledged that, after his plea and prior to his sentencing, his counsel submitted a motion for downward departure that included statements from both Rosenbaum and White regarding ownership of the medication and knowledge that it has been in Buhs' safekeeping.  *Id.*at 26.

Buhs said he entered the plea because his counsel advised him to enter the no contest plea and told him the medication would not be an issue when he explained to the court where it came from.  *Id.* at 27.  Buhs testified that his counsel did not discuss any potential defenses with him and instead "was pushing on the assistance issue."  *Id.*

After being incarcerated, Buhs first learned about the prescription defense in 2014.  *Id.* at 27-28.  Buhs testified that his counsel had not told him he could raise that defense if he proceeded to trial and:

> Q. Had you been aware of that defense at the time of your plea, would you have entered your plea?
>
> A. No, I would not.
>
> Q. What would you have done?

> A. I would have taken it to trial, if that's what was required. I had no knowledge that that was the proper steps.  Due to my lack of knowledge at the beginning of this, I went along with what Mr. Auerbach had proposed. I trusted that he was looking out for my interest.
>
> Q. Why would you have proceeded to trial?
>
> A. If that's the proper means to deal with something that I didn't believe that I had done wrong, then that's what I would have done.

*Id.* at 28.

Buhs attempted to provide substantial assistance to law enforcement because he was concerned about the possession of weapons charge.  *Id.* at 28-29.  At the time, "the morphine had not become an issue, so my concern was about the weapons." *Id.* at 29.  He understood he was looking at three to five years on the weapons charge and he "was trying to lessen that damage." *Id.*  However, because he had no actual concrete information to provide to law enforcement, he was acting on "a wing and a prayer on that one." *Id.* at 29.  When asked if he discussed this with counsel, Buhs said that his counsel "didn't want to know." *Id.*

On cross-examination, Buhs agreed that the police found about 20,000 pounds of fireworks and about 19 firearms at his home; he identified a photograph of the firearms.  *Id.* at 30; DE 51-1 at 226.   Other than the morphine found in his home, Buhs agreed to having other prescription medications for alprazolam/xanax in his name located on top of his dresser; he identified a photo of the pills on top of the dresser.  DE 61 at 30-31; DE 51-1 at 270.  Buhs agreed he placed the morphine inside of a white plastic bag in an air conditioning vent along with other items— including firearms; he identified photographs of the vent and its contents.  DE 61 at 30-31; DE 51- 1 at 286, 290, 306.

On the day of his arrest, Buhs agreed he was taken to the police station and questioned by ATF Agent Columns and Detective Sirmans.  DE 61 at 32-33.  During the interview, he admitted

to being "in a bad situation" as the guns were his and he should have not had them because he was

a felon with a prior federal gun conviction.  *Id.* at 33.  Indicating interest in helping himself and

before he had an attorney, Buhs started to give Agent Columns some information about "potential

militia types" he could potentially get in touch with through gun shows or through other people.

*Id.* at 33, 45.

After retaining his defense counsel, Paul Auerbach, Buhs told his counsel the potential of

doing substantial assistance.  *Id.* at 34.  Prior to entering his plea about three weeks after his arrest,

Buhs met with the prosecutors, law enforcement, and his counsel.  *Id.*  At the meeting, Buhs went

over all the details involved in helping law enforcement and he signed a substantial assistance

agreement.   *Id.* at 35; DE 51-1 at 13-16.   In the agreement, Buhs admitted responsibility,

knowledge, and participation in the charged crimes. DE 61 at 35.  Buhs agreed that the State did

not want to enter into the agreement.  *Id.* at 36.

When  Buhs  realized  during  the  meeting  that  he  was  being  charged  with  the

alprazolam/xanax charge, he "kind of freaked out" and asked his counsel "six, eight times at least

why I was being charged with my own medication."  *Id.* at 36-37.  His counsel "stepped off and

had a conversation with somebody" and his counsel told Buhs it would be set aside.  *Id.* at 36.

Buhs was told toward the end of the meeting that that alprazolam charge would be dismissed.  *Id.*

No one told Buhs during the meeting that the morphine charge would be dismissed; Buhs said only

his counsel told him that.  *Id.* at 37.  Buhs did not stop the meeting, explaining he "was totally

overwhelmed" and "was trusting Auerbach to keep things straight."  *Id.* at 37-38.

Buhs' change of plea hearing was held the same day as the substantial assistance meeting.

*Id.* at 37-38.  He thought it would be an arraignment, but it turned out to be a change of plea

hearing, which he did not understand as "[e]verything was moving very quickly."  *Id.*  Buhs

admittedly did not tell the judge he did not understand what was going on or ask for more time. *Id.* at 38. Buhs identified the plea form he signed and initialed in advance of the change of plea hearing and agreed that the form listed all the charges, the mandatory minimum sentence of 25 years, and the total possible sentence of 50 years. *Id.* at 39-40; DE 51-1 at 5-11. Buhs said he went over the form with his attorney and the Judge. DE 61 at 40-41. Buhs knew at the plea hearing that the Judge could sentence him to the maximum sentence of 50 years as set forth on the plea form unless the State agreed to a particular sentence based on substantial assistance. *Id.*

Buhs agreed he indicated at the hearing he was giving up his right to go to trial, and contest the evidence, and present any defenses he may have had—"all based on advice of counsel." *Id.* at 41. He told the Judge no one forced or coerced him to enter the open plea and he was doing it because it was in his best interests. *Id.* at 41-42. He agreed the Judge warned him his counsel could have more time to investigate defenses, but he was waiving that right to do the substantial assistance. *Id.* Buhs had no questions for the Judge during the hearing and he did not ask for more time to think things over. *Id.* at 43. At some point during the hearing, his counsel provided a prescription for the alprazolam/xanax after which the State agreed to drop that charge. *Id.* at 44.

Buhs hoped for a downward departure based on providing substantial assistance. *Id.* at 45. After his plea hearing, while on bond, Buhs worked with the ATF agent for a few months and tried to provide him information in hopes of receiving a lower sentence. *Id.* at 44-45. Ultimately, Buhs was unable to provide substantial assistance. *Id.* at 45.

At sentencing, the alprazolam/xanax charge had been dropped. *Id.* at 46. However, the State did not agree to drop the morphine charge despite the information provided by defense counsel. *Id.* Buhs was sentenced to the mandatory minimum of 25 years on the morphine charge and the maximum sentence of 15 years on the firearms charge. *Id.*

Buhs agreed the prescription defense he first learned about while incarcerated applied only to the morphine charge, not to the fireworks or firearms charges.  *Id.* at 47-48.

In response to my questioning, Buhs initially testified that his change of plea hearing was the first time he was advised by a Judge of the charges against him and "that's when I found out I was being formally charged with the morphine."  *Id.* at 50.  Buhs then said that prior to the substantial assistance meeting, his counsel told him about the morphine charge but his counsel "told me that:  Don't sweat it.  We're just going to plead no contest to it.  And he was sticking to his—his original statement of the fact that when he explained to the court where it came from, that it wasn't going to be a problem.  So I trusted in what he was telling me."  *Id.* at 52-53.  Buhs indicated that his counsel told him to plead no contest to the morphine charge and that when counsel explained to the court where it came from, it would be nolle prossed.  *Id.* at 53.  When asked if he raised any issue about pleading guilty to the morphine charge at the substantial assistance meeting when he raised an issue about the alprazolam/xanax charge, Buhs responded no.  *Id.* at 54.  Buhs said his counsel provided the information about where the morphine came from to the State on the morning of sentencing.  *Id.*

Next, **Martin County Sheriff's Office Detective Jacob Sirmans** provided the following sworn testimony.  He and another detective made an undercover purchase of fireworks from Buhs inside of Buhs' home.  *Id.* at 60.  Based on their observations during the undercover buy— including a very large gun safe and a large quantity of fireworks in plain view—Detective Sirmans applied for a search warrant the same day.  *Id.* at 60-62.  Once Buhs' arrived home, law enforcement stopped him in the driveway, read *Miranda* to him, and then executed the warrant which took "hours and hours."  *Id.* at 62-63.  Buhs' case stood out in Detective Sirmans' mind as unique because of the large quantity of fireworks recovered: 20,000 pounds stored in various

bedrooms, a shed, and a storage unit; Detective Sirmans described 30 different photographs of fireworks and firework-related components.  *Id.* at 61, 64-70; DE 51-1 at 218-24, 228-64, 268, 276-84, 300-02.  Detective Sirmans also located multiple firearms of various types throughout Buhs' residence, including some left out in the open, some left in the gun safe, and some stored in an air conditioning vent; he identified a photograph containing all the guns that were recovered and additional photographs of guns and paraphernalia as they were found in Buhs' home.  DE 61 at 70-72; DE 51-1 at 226, 266, 304, 322.

Detective Sirmans left as the extensive search was underway to interview Buhs at the police station following his arrest.  DE 61 at 63-64, 73.  Detective Sirmans described the interview as "very cordial" although Buhs "knew he was in a bad spot" and knew the kind of trouble he was in. *Id.* at 73-74.  Buhs did not contest ownership of the firearms or fireworks and he admitted to selling the fireworks.  *Id.* at 74.  Buhs acknowledged he should not have possessed the firearms and should not be selling fireworks, which he likened to a hobby.  *Id.*  They discussed the possibility of substantial assistance and Buhs seemed interested.  *Id.* at 74-75.

As Buhs was being booked into the jail after the interview, Detective Sirmans got a call that drugs were found concealed in an air conditioning vent in Buhs' home.  *Id.* at 72-73, 75-76, 83.  When Detective Sirmans asked Buhs about the drugs found in the vent, Buhs "said he had forgotten about those, they were old, and it wasn't something he used regularly."  DE 61 at 77-78. Buhs did not tell Detective Sirmans that they belonged to someone else or that he was just holding them; Buhs also did not deny ownership of the drugs.  *Id.* at 78.

Detective Sirmans rephotographed the multiple bottles of drugs found in the vent for evidentiary purposes and he described all the bottles that were found.  *Id.* at 78; DE 51-1 at 308-20.  The following photograph showed the three bottles containing morphine pills:



DE 61 at 79-80; DE 51-1 at 314. As they were found in Buhs' home, none of these three bottles had a name on them, a prescription number, prescribing doctor information, or directions on how to take the prescription. DE 61 at 80-81. The only medical information was a portion of a label on one bottle reading "Morphine S04 15 milligram, quantity 270 tablets," and a portion of a label on a second bottle reading "Morphine S04 30 milligram;" the third bottle had a United States Postal Service label on it with no other identifying information. *Id.* at 80. There was 51.6 grams total worth of 30-milligram pills, and 38.5 grams worth of 15-milligram pills. *Id.* at 88; DE 11-2 at 649 (Detective Sirmans' Narrative Report).

A single bottle of liquid morphine found in the vent had an expiration date of June 2008, and prescribing information with a last name of Neary. DE 61 at 81; DE 51-1 at 318, 320.

Only one bottle in the vent was prescribed to Buhs, and it was baclofen, not alprazolam/xanax or morphine. DE 61 at 79, 81; DE 51-1 at 310. Only one bottle in the vent was prescribed to Jerry White and it was not morphine; it was a bottle of baclofen 20-mg tablets, prescribed in Madison, Wisconsin. DE 61 at 79; DE 51-1 at 310. There was also another bottle of baclofen with the prescribee's information removed. DE 61 at 82; DE 51-1 at 310. There was alprazolam/xanax found in the vent as well; it had no label. DE 61 at 81-82; DE 51-1 at 310.

Detective Sirmans identified three photographs of prescription drug bottles found in plain

view on a bedroom dresser which were prescribed to Buhs, including alprazolam/xanax.  *Id.* at 73;

DE 51-1 at 270, 272, 274.

In response to my questioning, Detective Sirmans stated that he remembered asking Buhs about the hidden prescription medications after reading the following statement included in his narrative report dated July 6, 2009: "When asked about the hidden prescription medications, Buhs stated, 'I forgot about those.' Buhs advised the hidden medications were 'old' and that he did not use them regularly."  DE 61 at 83-85; DE 11-2 at 649 (Detective Sirmans' Narrative Report).

Next, **Assistant State Attorney David Lustgarten** gave the following sworn testimony. He, fellow state prosecutor Chris Gaston, and ATF Agent Pat Columns were present when the warrant was executed at Buhs' home on July 2, 2009.  DE 61 at 94-95.  Lustgarten observed thousands of rounds of ammunition underneath a kitchen island.  *Id.* at 95-97; DE 51-1 at 292-98. He also observed the items found in the hallway air conditioning vent, which included a pair of binoculars, guns, gun paraphernalia, and a white plastic bag containing drugs.  DE 61 at 97-99; DE 51-1 at 286-90, 306.

Lustgarten believed the state had a strong case to convict Buhs on the fireworks charge and he would have "absolutely" proceeded to trial on that charge and likely secured a conviction based on the undercover buy and the physical evidence of fireworks all over.  DE 61 at 99-100. Lustgarten would also have "absolutely" taken the firearms charge to trial and was confident he would have secured a conviction based on the close to 20 firearms, including assault weapons, and thousands of rounds of ammunition that were recovered from the residence as well as Buhs' post-*Miranda* admissions.  *Id.* at 100.

As charged in the information, Buhs faced a potential maximum sentence of 50 years in prison plus 60 days in jail comprised of up to 30 years for the first degree felony of morphine

trafficking, up to 15 years on the second degree felony possession of a firearm by a convicted felon, up to 5 years on the third degree felony possession of alprazolam, and up to 60 days in jail on the second degree misdemeanor of illegal sale of fireworks. *Id.* at 102-03. Given the *nolle prosequi* on the alprazolam charge, the charges Buhs pled to exposed him to a potential maximum sentence of 45 years plus 60 days. *Id.* at 103.

If Buhs had successfully provided substantial assistance, he could have been sentenced to something as low as three to five years. *Id.* Lustgarten was involved in the substantial assistance meeting. *Id.* at 103. It was Lustgarten's understanding that Buhs initially spoke to law enforcement about substantial assistance, possibly during his post-arrest interview. *Id.* at 106. The State Attorney's Office ("SAO") did not want to enter into the substantial assistance agreement but was encouraged to do it based on statements by ATF Agent Columns that Buhs might "be in a position to land [] bigger fish" such as persons involved in explosives and bomb making for right-wing militia organizations. *Id.* at 105-06. The SAO and ATF Columns discussed substantial assistance for "the better part of two weeks following the arrest." *Id.* at 106. ATF Agent Columns said that Buhs was on ATF's radar; they knew who he was and people he knew. *Id.* at 115. ATF Agent Columns' representations about the strength of the information Buhs could provide is what led SAO to allow Buhs to enter the substantial assistance agreement because "[o]therwise, there's no way we'd normally do that; not with that amount of drugs and the firearms and the ammunition. It's very unusual for Martin County." *Id.* at 115-16. According to Lustgarten, the SAO agreed to allow Buhs to engage in substantial assistance before Buhs was formally charged with morphine trafficking and alprazolam possession as these charges were added post-arrest. *Id.* at 106-07.[2]

---

[2] For ease of reader reference in placing Lustgarten's testimony in context, I find it helpful to include here the timeline of events according to the record. On July 2, 2009, Buhs was arrested. DE 11-2 at 8-9 (Arrest Affidavit). On July 16, 2009, the four-count information against Buhs was filed. *Id.* at 61-62 (Information). The written substantial assistance agreement is signed on July 21, 2009, DE 51-1 at 12-16 (Substantial Assistance

At the substantial assistance meeting, Buhs was not hesitant and seemed eager to help himself out by providing substantial assistance. *Id.* at 107. Everything was thoroughly explained to Buhs at the meeting, including expectations and "that attempts are not going to be good enough." *Id.* No promises were made and Buhs never indicated that he might not be able to provide substantial assistance. *Id.* at 108. Lustgarten did not recall Buhs "freaking out" about the alprazolam charge or interrupting the meeting to ask why he was being charged with possession of alprazolam. *Id.* at 104. Buhs struck Lustgarten "as a pretty cool customer, actually." *Id.* at 109. Even though Buhs had not yet been formally charged with the two drug counts, he "clearly knew the charges" and "what he was getting himself into." *Id.* at 109. It was in the substantial assistance agreement Buhs signed. *Id.*; DE 51-1 at 13-16 (Substantial Assistance Agreement, signed July 21, 2009).

Lustgarten said that defense counsel gave him Buhs' prescription for alprazolam at Lustgarten's office prior to entry of the plea. DE 61 at 110-11. Based on that, the State advised the court that they would *nolle prosequi* the alprazolam charge; Buhs did not plead to this charge which was held in abeyance until sentencing. *Id.* at 111. Lustgarten did not receive information about the morphine at that time; information about the morphine belonging to others was "eventually" provided later. *Id.* at 111-12.

Lustgarten would "absolutely" not have dropped the trafficking charge based on the witness letters, or even if he had been given prescription information. *Id.* at 112-13. He would still have gone to trial on the trafficking charge based on the lack of labels on the morphine bottles; the length of time the morphine was allegedly being held for others and the fact that one of the alleged prescription holders was deceased; the "very odd" place where Buhs chose to store the

---

Agreement), which is the same day Buhs signed his felony plea agreement and appeared in court for his plea hearing. *Id.* at 5-11 (Felony Plea Form); 92-114 (Change of Plea Hearing Transcript).

morphine; the fact that firearms were involved and also found in the vent together with the morphine; and Detective Sirmans' written report about what Buhs told him after the drugs were found.  *Id.* at 112-14.  Lustgarten believed that if the case had gone to trial, he had a strong case that would have resulted in a conviction on all counts as charged.  *Id.* at 116.

Lustgarten expressed familiarity with the presiding state court judge and anticipated that the judge would have given Buhs the statutory maximum of 15 years on the firearms charge based on the facts of the case and the judge's well-known feelings about firearm crimes.  *Id.* at 100-02. In Lustgarten's view, Buhs would have likely received a harsher sentence following a trial and Buhs' best chance to avoid a harsh sentence was to successfully provide substantial assistance.  *Id.* at 117-18.

In response to my questioning about the timing of Buhs' charges, Lustgarten explained that, within 21 days of a felony arrest in Martin County, state prosecutors take sworn testimony from law enforcement/witnesses and review the evidence at a state attorney hearing to decide which charges to bring.  *Id.* at 120-21.  On the night of Buhs' arrest, Detective Sirmans did not have enough information on the drug possession and trafficking charges, so those two charges were added later to the two original charges for firearms possession and unlawful sale of fireworks. *Id.* at 121.  Lustgarten could not say what day the two drug charges were added but said it was probably either the day before or the day of Buhs' plea hearing on July 21, 2009.  *Id.* at 121-22.

When asked why everything happened so quickly before Buhs' first court appearance considering that the later-added morphine charge carried such a high penalty, Lustgarten responded that the state endeavors to have substantial assistance situations occur as quickly as possible.  *Id.* at 124-25.  This is because the state does not want to have a defendant engage in substantial assistance and then decide to go to trial, which would not benefit the state.  *Id.* at 125.

Also, the information is "hot" and would not do law enforcement any good weeks later.  *Id.* Another reason substantial assistance situations happen quickly is to make it harder for the bad guys to know that someone might be engaging in substantial assistance.  *Id.*  For these reasons, it was not atypical for a substantial assistance defendant to plead guilty at their first court appearance. *Id.* at 125-26.

Lustgarten agreed that Buhs could have pled to the firearms and fireworks charges and gone to trial solely on the morphine trafficking charge, but there would have been no benefit because the state would not have agreed to substantial assistance and all the charges were inextricably intertwined and the jury would have heard about them all anyway.  *Id.* at 127.

Lustgarten confirmed that the SAO does not enter into substantial assistance agreements unless the defendant pleads guilty.  *Id.* at 133.  Where a defendant seeks for the state to recommend a lesser sentence, the defendant has to enter a plea of guilty.  *Id.* at 135.

Last to testify was former **Assistant State Attorney Christopher Gaston**, who provided the following sworn testimony.  After reviewing and approving the search warrant, Gaston observed its execution.  *Id.* at 144.  Gaston felt the state had "a very strong case" in light of the "pretty overwhelming" evidence.  *Id.* at 146.  If the state had taken the case to trial and secured convictions on the charges, Gaston believed it would not have been unreasonable to seek a sentence of 30 years or more in Martin County, especially in light of what was found in the house.  *Id.*

Regarding substantial assistance, Gaston's recollection was that Buhs spoke to ATF Agent Columns about it while on scene to try and help himself or reduce the charges.  *Id.* at 146-47. Gaston noted that substantial assistance is not available if a defendant demands trial or files motions to suppress evidence' a defendant either takes responsibility for his actions and tries to work with the government or they go forward with preparing for trial.  *Id.* at 147.  If Buhs had

tried to challenge something or assert a defense, the substantial assistance agreement would not have been available to him.  *Id.*

Gaston communicated the information about all the charges to Buhs' attorney.  *Id.* at 148. Buhs was "[n]ot at all" surprised by any of the charges or evidence discussed during the substantial assistance meeting.  *Id.*  Buhs was quiet and pensive during the meeting and he seemed eager, not hesitant, to enter into the agreement.  *Id.* at 148, 151.  The SAO was "not eager to do it" but Buhs had been communicating with the ATF agent and it seemed that he believed he could provide compelling evidence.  *Id.* at 148-49.  Buhs never appeared agitated about the alprazolam charge. *Id.* at 151.  No promises were made to Buhs and the state's recommendations at sentencing "would be based on the type of assistance and the caliber of assistance" provided by Buhs but in order for Buhs to get a lower sentence–less than the minimum mandatory—this would "absolutely" have been the way he had to do it.  *Id.* at 150.  Buhs never asked for more time to think about it, either at the meeting or at the change of plea hearing.  *Id.* at 150-51.

Regarding the morphine charge, Gaston would not have entered a *nolle prosequi* based on the letters submitted regarding where the morphine came from; "the facts and circumstances around how the morphine was found" would not have led him to drop the charge.  *Id.* at 151-52. Gaston would still have taken the morphine charge to trial even knowing this was Buhs' defense. *Id.* at 153. Gaston noted that the morphine were found "in baggies" in a ventilation duct along with a firearm,[3] and Buhs' claim that he put the morphine in the vent for safekeeping "just didn't make sense" when he had a huge safe in his house.  *Id.* at 153.  Gaston's prior experience as a probation officer in Georgia led him to believe that this seemed like someone keeping drugs unlawfully; people would hide things in vents because of a misconception that, when the air was blowing, it

---

[3] As can be seen in photographs of the vent as it was discovered, the morphine was actually in bottles but those bottles were contained within larger white grocery-style plastic bags.  DE 51-1 at 288, 290.

would confuse the scent and drug dogs would have a problem locating the drugs, and drug dealers would often keep guns with their drugs as well.  *Id.* at 153-54.  Gaston did not think Buhs had a credible defense to the trafficking charge and there was a strong likelihood of conviction. *Id.* at 154.  After a trial, Gaston would have asked for more than 25 years.  *Id.*

Gaston agreed that defense counsel's testimony at the motion to withdraw plea hearing was that he focused on the warrant because if it was bad the whole case would fall apart.  *Id.* at 155. All the charges would likely have gone away except the fireworks charge. *Id.* at 155-56.  The only other way for everything to potentially go away or for Buhs to get a lesser sentence would be if provided substantial assistance or prevailed at trial. *Id.* at 157.

On cross-examination, Gaston agreed that he would not have had any ground to exclude the authors of the letters regarding the morphine found in Buhs' home from testifying at trial.  *Id.*

## STANDARD OF REVIEW

The Eleventh Circuit has already determined that "the state court's ruling was based on an unreasonable determination of facts" which, in turn, "opens the door" to a *de novo* review of Buhs' sole IAC claim.  *Id.* at 630; *see also id.* at 625 (quoting *Jones v. Walker*, 540 F.3d 1277, 1288 n. 5 (11th Cir. 2008) for proposition that a federal habeas court is "not bound to defer to the unreasonably-found facts or to the legal conclusions that flow from them" when a state court's adjudication of a habeas claim is based on an unreasonable determination of the facts in light of the state court record); *Cooper v. Sec'y, Dep't Corrs.,* 646 F.3d 1328, 1352–53 (11th Cir. 2011) ("When a state court unreasonably determines the facts relevant to a claim, 'we do not owe the state court's findings deference under AEDPA,' and we 'apply the pre–AEDPA *de novo* standard of review' to the habeas claim.") (quoting *Jones*, 540 F.3d at 1288 n.5)).

A claim of ineffective assistance under the Sixth Amendment is governed by the familiar two-prong standard announced in *Strickland v. Washington*, 466 U.S. 668 (1984).  IAC claims are difficult claims to sustain.  *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (*en banc*) ("[T]he cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between.").  To prevail on an IAC claim, a petitioner must show (1) counsel's performance was deficient, meaning that it failed to meet an objective standard of reasonableness, and (2) the petitioner's rights were prejudiced as a result of counsel's substandard performance.  *Gomez-Diaz v. U.S.* 433 F.3d 788, 791 (11th Cir. 2005) (citing *Strickland*, 466 U.S. at 687) (internal citations omitted); *see also Gordon v. U.S.*, 518 F.3d 1291, 1297 (11th Cir. 2008).   A petitioner has the burden to prove both *Strickland* prongs and a court "'need not address both prongs if the petition has made an insufficient showing on one of them.'" *Bishop v. Warden, GDCP*, 726 F.3d 1243, 1254 (11th Cir. 2013) (quoting *Strickland*, 466 U.S. at 697).

As to the first prong, performance is deficient if "it f[alls] below an objective standard of reasonableness and [i]s outside the wide range of professionally competent assistance." *See Johnson v. Sec'y, DOC*, 643 F.3d 907, 928 (11th Cir. 2011).  In determining whether counsel's conduct was deficient, courts must, with much deference, consider "whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688; *see also Dingle v. Sec'y for Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007). "The test has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done." *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc).  The only question is "whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Id.*  "[C]ounsel is strongly presumed to have rendered adequate assistance

and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.  "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.  Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.*

As to the second prong, to establish prejudice, the petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  A petitioner must show more than that "the error had some conceivable effect on the outcome of the proceeding." *Id.* at 693.  To show prejudice when a petitioner challenges his plea based on IAC, he must show a reasonable probability that but for the ineffective assistance, "'he would have not pleaded … and would have insisted on going to trial.'" *Durham v. Sec'y, Dep't of Corr.*, 834 F. App'x 843, 847 (11th Cir. 2020) (quoting *Hill*, 474 U.S. at 58-59).  "When a defendant claims that his counsel's deficient performance deprived him of a trial by causing him to accept a plea, the defendant can show prejudice by demonstrating a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Spriggs v. U.S.*, 703 Fed. Appx. 888, 890-91 (*quoting Lee v. U.S.*, 137 S. Ct. 1958, 1967 (2017).  A reasonable probability is a probability sufficient to undermine confidence in the outcome. *See Morris v. Sec'y, Dep't of Corrs.*, 677 F.3d 1117, 1127 (11th Cir. 2012).

*Strickland's* two-prong standard applies to guilty pleas.  *Lafler v. Cooper*, 566 U.S. 156, 162–63 (2012) (citing *Hill v. Lockhart*, 474 U.S. 52, 58 (1985)).  In the guilty plea context, a petitioner must "convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010).

**DISCUSSION**

Against the above backdrop, I now turn to a *de novo* analysis of Buhs' sole claim of IAC. I will address both *Strickland* prongs, beginning first with counsel's performance before turning to consequent prejudice.

### A.        Counsel's Performance

To be entitled to relief, the first hurdle Buhs must clear is establishing that his counsel rendered constitutionally deficient performance.  Upon *de novo* review of the record and based upon evidence adduced at the evidentiary hearing, I find that Buhs has surpassed this first hurdle.

Buhs' sole claim is that his counsel was constitutionally ineffective for failing to advise Buhs of a viable prescription defense to the morphine trafficking charge at the plea stage. Importantly, prior to the evidentiary hearing, the Eleventh Circuit agreed with my previous assessment that a prescription defense[4] was available to Buhs and that this defense was viable. *Buhs*, 809 F. App'x at 631 (11th Cir. 2020) ("The record also suggests that the defense was viable,

---

[4]  The prescription defense is codified in Fla. Stat. § 893.13(6)(a), which provides:

> It is unlawful for any person to be in actual or constructive possession of a controlled substance unless such controlled substance was lawfully obtained from a practitioner or pursuant to a valid prescription or order of a practitioner while acting in the course of his or her professional practice or to be in actual or constructive possession of a controlled substance except as otherwise authorized by this chapter.

*See also McCoy v. State*, 56 So. 3d 37, 39 (Fla. 1st DCA 2010) (the prescription defense is available to an innocent possessor of a controlled substance only when that person has a legally recognized reason for possessing prescription medication that is prescribed to another).  I note that the *McCoy* decision was rendered after the guilty plea proceedings at issue in this case.  This timing could arguably be grounds for an assertion that counsel's conduct did not rise to the level of constitutionally IAC because counsel did not have the full benefit of *McCoy* when he was advising Buhs.  This issue has not been flagged by either party.  Even if it were, I would not be persuaded because the language of the statute itself is so unmistakably plain that any reasonable counsel would have thought to research or investigate whether it applied or presented a viable defense under the circumstances in this case. *Cf. Smith v. Singletary*, 170 F.3d 1051, 1055 (11th Cir. 1999) (affirming finding that defense counsel was not ineffective in advising prisoner that out-of-state conviction could not be used to enhance his sentence under Florida's habitual violent offender law because the statute at issue there was "not so unmistakably plain that no reasonable lawyer could have misconstrued it.").

33

such that it would have been incumbent upon Mr. Auerbach to conduct appropriate legal and factual research before abandoning the strategy or deciding not to advise Mr. Buhs about the defense.") (citing *Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations."); *see also Buhs*, 809 F. App'x at 632 ("We agree with the magistrate judge that there was no legal bar preventing Mr. Buhs from presenting a prescription defense to a jury."). Now, following the evidentiary hearing, I find that there is no evidence that Buhs' counsel investigated or considered the prescription defense before Buhs entered his guilty plea to the morphine trafficking charge and that this failure to investigate rises to the level of constitutionally deficient performance in light of all the circumstances. *See Strickland*, 466 U.S. at 690 (regarding counsel's performance, *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.").

Buhs testified at the evidentiary hearing that he entered his no contest plea based on his counsel's advice. Because Buhs' counsel was not available to testify at the evidentiary hearing, I turn to contemporaneous record evidence at the time of Buhs' guilty plea for additional context and insight. The record shows that at the time Buhs entered his guilty plea, he had not received discovery and his counsel had not gone over with Buhs what he believed the state's evidence against Buhs would be. Instead, Buhs' counsel's investigation into the case was limited singularly and squarely to counsel's review of the search warrant and his determination that the warrant was valid. This overall strategy of Buhs' counsel is best distilled from counsel's testimony at the state court plea withdrawal hearing when counsel discusses the "critical" nature of reviewing the search warrant because, in his own words, "if the search warrant wasn't good, then the case fell apart." DE 61 at 310; *see also Buhs*, 809 F. App'x at 627-28 (stating that this colloquy with Buhs' counsel "may have been the best window into Mr. Auerbach's overall trial strategy"). Buhs' testimony at

the January 2021 evidentiary hearing coincided with this prior testimony by his counsel.  *See* DE

61 at 21 (Buhs' testimony that, prior to his change of plea hearing, his counsel reviewed the warrant

and determined it was valid).

Buhs also testified at the evidentiary hearing that, prior to entering his plea, he informed

his counsel of the circumstances of how he came to possess the morphine found in his home.  Buhs

explained that he was holding the morphine on behalf of other valid prescription-holders.  Buhs

further testified that his counsel never advised him about the possibility of asserting a prescription

defense at a trial and that Buhs did not learn about the defense until after he was incarcerated.  This

testimony by Buhs is consistent with what Buhs declared under oath in his state court post-

conviction pleadings.  DE 11-2 at 258-62 (Motion to Withdraw Plea) (declaring that, pre-plea,

Buhs told his counsel of the circumstances surrounding the morphine charge which would have

resulted in a "viable defense" to this charge); 463-75 (Rule 3.850 Motion for Post-Conviction

Relief) (claiming IAC based on counsel's "failure to advise him of the availability of a prescription

defense if he proceeded to trial" despite being aware that Buhs was holding the morphine for third-

party prescription holders).  Buhs' testimony and this coinciding record evidence is unrefuted.

Thus, Buhs has established that despite his counsel's awareness of the pertinent circumstances, his

counsel never investigated the prescription defense or advised Buhs of the possibility of presenting

this defense to the morphine charge if he were to opt not to plead guilty and instead proceed to

trial.  On the contrary, Buhs' counsel testified at the plea withdrawal hearing that he did not inform

Buhs that the circumstances of his morphine possession "would somehow amount to [a] legal

defense or a reason that the Court will dismiss the charge of trafficking" based on counsel's opinion

that "the circumstances plus the ATF cooperation would result in a diminished sentence."  *Id.* at

312-13.

Respondent argues that "counsel was not deficient for failing to apprise [Buhs] of a defense that did not have substantial likelihood of success."  DE 64 at 50.  Respondent relies upon testimony by Detective Sirmans and the two state prosecutors at the evidentiary hearing as establishing that the defense would not have been successful at trial—for instance, Detective Sirmans' testimony that the morphine pill bottles did not have labels with any name(s), prescription number(s),[5] or prescribing doctor information; the prosecutors' testimony that it was "odd" and "didn't make sense" for Buhs to store the morphine in a vent rather than the available gun safe; and prosecutor Gaston's experience that individuals sometimes hide drugs in vents in a misconceived effort to avoid drug dog detection.  However, just because there may be facts weighing against application of the defense does not render the defense non-viable such that Buhs' counsel was relieved of his constitutional obligation to investigate, research, and advise his client about it.  This is especially true here where the record establishes counsel's awareness of facts weighing in favor of the defense—for instance, the letters authored by witnesses regarding the morphine prescription holders who could presumably testify at trial; information that Buhs' was a hoarder; and the lack of any evidence that Buhs actually sold or distributed drugs to others.

Ultimately, had the case proceeded to trial, the jury would weigh evidence and witness credibility to determine these issues.  And, importantly, because the defense constituted Buhs' only affirmative defense to the morphine trafficking charge "and there was substantial, albeit conflicting, evidence concerning the defense" along with Buhs' counsel's minimal involvement in the substantial assistance approach, the circumstances here present a situation of fundamentally deficient performance by counsel.  *See McCoy*, 56 So. 3d at 41.  The bottom line is that Buhs' counsel performed deficiently by advising Buhs to plead guilty to trafficking morphine a mere

---

[5] The alprazolam also did not have labels with a name, but Buhs was subsequently able to produce a prescription nonetheless, causing the State to drop that charge.

three business days after Buhs was formally charged with that offense without evaluating a viable defense or advising Buhs of the option of proceeding to trial on the defense. *Buhs*, 809 F. App'x at 631 (11th Cir. 2020) ("The record also suggests that the defense was viable, such that it would have been incumbent upon Mr. Auerbach to conduct appropriate legal and factual research before abandoning the strategy or deciding not to advise Mr. Buhs about the defense.") (citing *Wofford v. Wainwright*, 748 F.2d at 1505, 1508 (11th Cir. 1984)); *see also Heard v. Addison*, 728 F.3d 1170, 1182 (10th Cir. 2013) (concluding that counsel's failure, during the plea-negotiation stage, to advise her client of viable alternative available defenses which any reasonable defendant would have deemed important considering the severity of the charges to which the defenses applied constituted constitutionally deficient lawyering).

Counsel's failure to advise Buhs of the prescription defense is compounded by other transgressions by counsel in the plea negotiation stage that came to light at the evidentiary hearing. Buhs testified that his counsel advised him to enter the no contest plea and indicated that the morphine trafficking charge would not be an issue when counsel explained to the court where the morphine came from at Buhs' sentencing. I find this testimony by Buhs credible. It is consistent with other record evidence and prosecutor testimony establishing that Buhs' counsel did not mention anything about how Buhs says he came to possess the morphine on behalf of other prescription holders until well after the plea negotiation stage and shortly before sentencing. Buhs' counsel's advice that the morphine trafficking charge would somehow be dealt with at sentencing was plainly wrong given the mandatory minimum sentence of 25 years that attached to the charge as soon as Buhs pled guilty to it. Submitting letters at sentencing to show why Buhs was holding the morphine could do nothing at that point without substantial assistance.

In addition, at the evidentiary hearing, the parties offered additional evidence and

testimony surrounding Buhs' attempted substantial assistance.  Buhs testified that he pursued the substantial assistance strategy out of concern for his firearms charge because when he first spoke with the ATF agent on the night of his arrest, the morphine trafficking charge was not yet an issue. Prosecutor Lustgarten confirmed that Buhs was originally charged with unlawful firearms possession and unlawful sale of fireworks because Detective Sirmans did not have enough information on the drug possession and trafficking charges when Buhs was first arrested.  Those two charges were added later, three business days before Buhs' plea hearing on July 21, 2009. Both prosecutors credibly testified that the State Attorney's Office did not want to enter the substantial assistance agreement with Buhs but ultimately did so in reliance on the ATF agent's statements that Buhs was in a position to render substantial assistance.

Buhs testified that his counsel "push[ed] on the assistance issue" but did not want to know details about it.  This testimony by Buhs is consistent with counsel's prior state court testimony that while counsel knew Buhs was cooperating with ATF, counsel had "very, very limited" involvement as it was "none of his business."  DE 11-2 at 310-11.  At a later state court hearing, while acknowledging that substantial assistance was the key to a downward departure, counsel testified that he was only "under the impression" that Buhs could provide substantial assistance based on a "feeling."  DE 51-1 at 200.  Counsel nonetheless signed the written substantial assistance agreement and previously conceded that it was "definitely" possible he told Buhs that he could get his sentence down to three to five years if he pled guilty and provided substantial assistance.  DE 11-2 at 313-16, 323-24.

This being the case, I find it troubling that there is no evidence that Buhs' counsel ever meaningfully assessed the nature of Buhs' assistance or the possibility that it would meet the very high bar needed to qualify as substantial assistance meriting a possible lowered sentence.  *See* DE

51-1 at 14 (substantial assistance agreement provisions explaining that Buhs' efforts must yield an arrest or conviction in order for the state to consider, in its sole discretion, recommending a lowered sentence and making clear that the court would not be bound by any such recommendation). Under the circumstances, counsel should have conducted at least a minimal assessment of the substantial assistance strategy before advising Buhs to plead guilty to a charge carrying a mandatory minimum penalty of 25 years in prison almost immediately after such a serious charge was formally brought. This is not to say that an early plea in hopes of substantial assistance is never appropriate. However, here, where all of Buhs' proverbial eggs were essentially being placed in the substantial assistance basket, counsel should have had some basic understanding of what information Buhs intended to provide and whether it was likely to yield results so that counsel could properly advise Buhs on the benefits and risks of substantial assistance attended to a guilty plea versus presenting a viable prescription defense at trial.

Respondent argues that counsel's actions were objectively reasonable because "[g]iven the very short amount of time [Buhs] had to enter into the substantial assistance and change of plea … it was eminently reasonable for counsel not to conduct further investigation into [the prescription] defense and to focus on possible challenges to the search warrant instead." DE 64 at 48-49. But there is no evidence in the record that counsel conducted any investigation into the defense at all. As advocates, counsel hold the important privilege of advising their clients on the law as it relates to the available facts. Indeed, "counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled." *Strickland*, 466 U.S. at 685. To fulfill constitutional requirements, counsel has "a duty to bring to bear such skill and knowledge as will render the trial a reliable

adversarial testing process." *Id.* at 688.  Failure to fulfill this duty through reasonable investigation of the law and facts undermines the adversarial process central to a defendant's right to a fair trial. *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (recognizing adversarial testing process generally will not function properly unless defense counsel has conducted reasonable investigation).

Here, Buhs' counsel plainly had a duty to provide Buhs with an understanding of the law in relation to the facts of his case so that Buhs could make an informed decision between pleading guilty to pursue the substantial assistance strategy or going to trial.  The evidence conclusively demonstrates that Buhs' counsel failed in this duty by not advising Buhs of the possibility of proceeding to trial where he would be able to assert a viable defense on the most serious charge of morphine trafficking.  Compounding this error, Buhs' counsel also failed in conducting any sort of meaningful assessment of the nature of what information Buhs had to provide in furtherance of the substantial assistance strategy.  Accordingly, based on all the evidence presented, I find that Buhs has established constitutionally deficient performance under *Strickland*.

### B.     Prejudice

To be entitled to habeas relief, Buhs must clear a second hurdle.  He must also establish that counsel's alleged errors caused him to suffer prejudice.

As guidance on remand, the Eleventh Circuit discussed the Supreme Court decision of *Lee v. U.S.*, which I find instructive with respect to prejudice.  *Lee*, 137 S. Ct. 1958 (2017).  In *Lee*, the defendant was a South Korean national who came to the United States with his parents as a teenager.  Lee remained for 35 years as a lawful permanent resident, without either becoming a United States citizen or returning to South Korea.  After being indicted for possession with intent to distribute ecstasy, Lee told his retained counsel about his non-citizen status and repeatedly asked

if he would face deportation as a result of the criminal proceedings.  Based on counsel's assurance that he would not be deported, Lee entered a plea of guilty and was sentenced to a year and a day in prison.  Lee pursued § 2255 relief when he learned that, contrary to counsel's assurances, he would be deported after serving his sentence.

At an evidentiary hearing, both Lee and his plea-stage counsel testified that "deportation was the determinative issue in Lee's decision whether to accept the plea."  Lee's counsel further testified that Lee's defense to the charges was weak, but had he known that Lee would be deported upon pleading guilty, he would have advised him to go to trial.  A reviewing magistrate judge recommended that Lee's plea be set aside and his conviction vacated. The district court declined to adopt the recommendation but issued a certificate of appealability.

The Sixth Circuit affirmed, finding that although Lee's attorney had performed deficiently, Lee could not show prejudice. It stated that Lee had no bona fide defense, and cited circuit precedent holding that "no rational defendant charged with a deportable offense and facing overwhelming evidence of guilt would proceed to trial rather than take a plea deal with a shorter prison sentence."

The Supreme Court held that counsel's deficient performance led not to a "judicial proceeding of disputed reliability," but rather to the forfeiture of an entire proceeding to which Lee had a right. *Lee*, 137 S. Ct. at 1965.  Lee's prospects of an acquittal were admittedly grim.  The Court nonetheless found credible Lee's position that had he known he would be deported upon conviction, he never would have accepted a guilty plea.  Rather, he would have gambled on trial, risking the possibility of more jail time for whatever small chance there might be of an acquittal that would let him remain in the United States. *Id.* at 1966.  The Court contrasted Lee's situation with that of a defendant who attempted to make a similar argument regarding the importance of

parole eligibility because the latter defendant was unable to show that he placed particular emphasis on his parole eligibility. *Hill v. Lockhart*, 474 U.S. 52, 60 (1985). The Court framed the dispositive question as not how a hypothetical trial would have played out, but rather whether absent the error and with proper advice there was an adequate showing that the defendant would have chosen to go to trial.

Similar to the petitioner in *Lee*, Buhs has consistently and credibly asserted that had he been advised by his counsel that he could assert a prescription defense at a trial, he would never have accepted a guilty plea.

In response, Respondent argues that "[u]nder the totality of the circumstances, it was clear the substantial assistance agreement and a change of plea were far more likely to provide [Buhs] with a positive outcome, and it cannot be said that a rational defendant would have rejected the opportunity to participate in the substantial assistance agreement in order to face the uncertainty of a trial that he was likely to lose." DE 64 at 55. I am not persuaded. Buhs' testimony, the testimony of the two individuals who submitted letters at sentencing, and the fact that the liquid morphine did indeed have a label on it prescribed to "Neary" could have provided competent, substantial evidence supporting a prescription defense. While Respondent points to contrary evidence (including that the morphine pills did not have a prescription label on them and the manner in which the morphine was stored), a jury question would have existed as to Buhs' guilt. It is true that the evidence shows that Buhs was intent on pursuing the substantial assistance strategy from the outset when he was arrested on the fireworks and firearms charges. But it is equally true that any success at this strategy was largely dependent on the type of information Buhs was able to provide and the willingness of authorities to arrest and prosecute. Buhs' assessment might reasonably have changed had he known of a viable defense to the later added morphine

trafficking charge.  Contrary to Respondent's assertions, it is reasonable to think that if Buhs been made aware of a viable defense to the most serious charge brought against him carrying the heftiest potential penalty, Buhs would have abandoned the substantial assistance strategy (which he was pursuing on his own without any meaningful assistance by his counsel) in favor of taking his case to trial.

In my view, Respondent has not presented evidence sufficiently rebutting Buhs' testimony that he would have proceeded to trial had he been made aware of the prescription defense.  That Buhs pursued a substantial assistance strategy is not conclusive proof that he would not have taken the gamble and gone to trial.  It simply shows that he chose a strategy he felt best while being completely in the dark on a viable defense which could have impacted the more serious morphine trafficking charge.  Under these circumstances and based on all the evidence, I find that there is a reasonable probability that Buhs would not have pleaded guilty and would have insisted on going to trial had his counsel made him aware of a viable defense.  *Strickland* prejudice is evident.

## **RECOMMENDATION**

Based on the foregoing, under a *de novo* standard of review, I find that the evidence proves that Buhs is being held in custody in violation of the Constitution or laws of the United States.  *See* 28 U.S.C. § 2254(a).  Accordingly, I respectfully **RECOMMEND** that Movant's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence [DE 1] be **GRANTED**, unless the State of Florida, within a reasonable period, grants Buhs a rehearing with respect to his conviction and sentence or vacates his sentence of incarceration and imposes a lesser sentence consistent with the law.

## <u>NOTICE OF RIGHT TO OBJECT</u>

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Robin L. Rosenberg, United States District Court Judge for the Southern District of Florida, within FOURTEEN (14) DAYS of being served with a copy of this Report and Recommendation. Failure to timely file objections shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).  Conversely, if counsel do not intend to file objections, they shall file a notice advising the District Court within FIVE (5) DAYS of this Report and Recommendation.

**DONE AND RECOMMENDED** in Chambers at Fort Pierce, Florida, this 23rd of May, 2022.

SHANIEK M. MAYNARD
U.S. MAGISTRATE JUDGE